UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| United States of America, | Case No.: 2:22-cr-00142-CDS-DJA |
|---|---|
| Plaintiff | **Order Granting Forfeiture Money Judgment in the Amount of $11,231,186.52** |
| v. | |
| Meelad Dezfooli, | |
| Defendant | [ECF No. 365] |

The government moves for entry of a forfeiture money judgment in the amount of $11,231,186.52 pursuant to 18 U.S.C. § 982(a)(2) against defendant Meelad Dezfooli. *See* ECF No. 365. Dezfooli opposes this motion. *See* Opp'n, ECF No. 368.[1] For the reasons stated below, I grant the government's motion.

I.   **Background**

   **A.   Procedural Background**

On September 4, 2024, Dezfooli was found guilty of three counts of bank fraud affecting a financial institution (Counts One through Three of the Superseding Indictment), three counts money laundering by concealment (Counts Four through Six of the Superseding Indictment), and four counts of engaging in monetary transactions in property derived from specified unlawful activity (Counts Seven through Ten of the Superseding Indictment). *See* Verdict, ECF No. 243. The jury also found that, pursuant to 18 U.S.C. § 3147, Dezfooli committed the offense charged in Count Ten of the Superseding Indictment while on pretrial release. *Id.*

Dezfooli also requested the retention of the jury to determine the forfeitability of specific property after the entry of the guilty verdict, pursuant to Rule 32.2(b)(5) of the Federal Rules of Criminal Procedure. *See* Forfeiture instr. & special verdict form, ECF No. 246. The jury found

---

[1] This motion is fully briefed. *See* Reply, ECF No. 370.

that two vehicles and five real properties were subject to forfeiture pursuant to 18 U.S.C. § 982(a)(2) based on the bank fraud convictions, and that the vehicles and one real property were also subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1) based on the money laundering convictions. *Id.* at 11–15. Upon the government's request, the court entered a preliminary order of forfeiture as to the vehicles and real property in accordance with the jury's special verdict.[2] *See* ECF Nos. 249, 251.

B. Factual Background

The government's evidence showed that Dezfooli conceived and implemented a scheme to defraud multiple financial institutions by submitting three Paycheck Protection Program ("PPP") loan applications to three different financial institutions, each of which was chock-full of materially false statements about defendant's business activity and the purpose of the loans. *See* Order denying mot. for j. of acquittal, ECF No. 372 (summarizing trial evidence). As a result of his schemes to defraud, Dezfooli received three PPP loans for three separate entities—Best Floors, Ltd; A-Series LLC; and Nevada Sales Limited—totaling $11,231,186.52. *Id.* The evidence also showed that Dezfooli then laundered the proceeds of his crimes, including by concealing the source of the funds through a series of real estate transactions and by engaging in other transactions with the proceeds. *Id.*

The PPP loan application process generally, and Dezfooli's specifically, was described in detail by a witness from each of the three defrauded financial institutions. *See id.* at 3–5. The financial institution witnesses, each of whom was directly involved in the approval and/or maintenance of the PPP loans at issue, provided testimony regarding the substance and materiality of the information defendant submitted with his PPP applications and the customer verification procedures their respective institutions employed to confirm Dezfooli's identity. *Id.*

---

[2] A jury may—and in this case did—only determine the forfeitability of specific property, not the amount of a money judgment. *See* Fed. R. Crim. P. 32.2(b)(5).

A representative from First Savings Bank (Witness 3)[3] testified about the bank's PPP loan verification procedures, including that applicants needed to provide two forms of identification, corporate documentation such as the articles of organization or bylaws, and the applicant's EIN number. *See* Trial tr. 2, ECF No. 308 at 148–49. A representative from U.S. Bank (Witness 4) described her bank's rigorous four-step verification procedure, which included a "know your customer" review, fraud analysis, payroll verification, and funding review. *See* Trial tr. 3, ECF No. 309 at 69–70.

Specific to Dezfooli's PPP application to U.S. Bank, Witness 4 also described the circumstances that led U.S. Bank to request that defendant provide a utility bill to confirm A-Series LLC's business address. *See id.* at 86–89; Gov't Ex. 211. Similarly, a representative from Cache Valley Bank (Witness 7) walked through her institution's own customer verification process, including but not limited to collecting identity information from beneficial owners, collecting business documents such as articles of incorporation, confirming that the business was in good standing, and confirming tax identification numbers with the Internal Revenue Service ("IRS"). *See* ECF No. 309 at 207–10. Additionally, with loans above $2,000,000, such as the Nevada Sales Limited loan, a senior loan officer would call the number on the application and ask the applicant's primary contact—and only the applicant's primary contact—a series of verification questions. *See id.* at 210–11.

The government also presented evidence regarding the materiality of certain aspects of the PPP loan application. Witness 3, Witness 4, and Witness 7 each testified that the amount of monthly payroll, the number of employees, and the business address reported on the PPP loan application were material to the review and ultimate approval of the loans. *See* Trial tr. 2, ECF No. 308 at 150, 151 (Witness 3); ECF No. 309, at 63–65 (Witness 4); ECF No. 309 at 204–05 (Witness 7). Each of the three bank witnesses also testified that their institutions would not have approved the loan if the applicant had not certified that funds would be used for the

---

[3] Witnesses are being identified based on the order they were called to testify.

intended purpose, i.e., payroll and other limited business expenses. ECF No. 308 at 152–53 (Witness 3); ECF No. 309 at 67 (Witness 4); ECF No. 309 at 207 (Witness 7). Lastly, Witness 3, Witness 4, and Witness 7 each unequivocally stated that their institutions would not have approved a PPP loan if they knew the supporting documentation, and in particular the IRS Form 940, was fictitious. ECF No. 308 at 150–51 (Witness 3); ECF No. 309 at 64 (Witness 4); ECF No. 309 at 205 (Witness 7).

The three bank witnesses also verified the information within Dezfooli's PPP loan applications and the amounts of the loans disbursed. The Best Floors, Ltd. application identified seventy-six total employees and $437,442.61 in monthly payroll, resulting in a PPP loan of $1,093,606.52 being disbursed to defendant on April 20, 2020. ECF No. 308 at 168, 195; Gov't Ex. 101. The A-Series LLC application identified ninety-six total employees and $585,912 in monthly payroll, resulting in a PPP loan of $1,464,780 being disbursed on May 6, 2020. ECF No. 309 at 79–80; Gov't Exs. 200, 201. The Nevada Sales Limited application identified 477 total employees and $3,469,142 in monthly payroll, resulting in a PPP loan of $8,672,800 being disbursed on May 8, 2020. ECF No. 309 at 214; Gov't Ex. 300. Taken as a whole, the three PPP loan applications Dezfooli submitted alleged that he paid each of his 650 employees an average annual salary of approximately $83,000.00 in 2019, amounting to $53,909,959.32 in 2019 payroll.

After establishing the source, materiality, and substance of the information in the PPP loan applications, numerous United States witnesses testified to the veracity—or lack thereof—of that information. While not an exhaustive list, the United States's evidence of false statements in the three PPP loan applications included:

- A court witness coordinator with the IRS (Witness 9) testified that none of Best Floors, Ltd, A-Series LLC, or Nevada Sales Limited had ever filed an IRS Form 940 and further specified that none of the IRS Forms 940 included in the loan applications were actually filed with the IRS. *See, e.g.*, Trial tr. 4, ECF No. 310 at 99, 110, 114. Moreover, several of Dezfooli's former employees testified that they

never had a coworker named Alejandra Rosales or Maria Gonzalez, the purported filers of the three IRS Form 940s. *See id.* at 151 (Witness 10); Trial tr. 5, ECF No. 311 at 144–45 (Witness 15); ECF No. 311 at 95–96 (Witness 14).

- A representative from NV Energy (Witness 5) testified that the utility bill that Dezfooli submitted as part of the U.S. Bank customer verification process had been altered. *See* ECF No. 309 at 129–31. Instead of being the energy bill for A-Series LLC, it was actually a utility bill for defendant's father. *See id.*; Gov't exs. 200, 3.02.

- Representatives from the Nevada Department of Education, Training, and Rehabilitation ("DETR") (Witness 8) and the IRS (Witness 9)—to which small businesses such as Dezfooli's are required to report wage and employee information—testified that the companies never reported more than seventeen employees at any one time and regularly reported far fewer. *See, e.g.*, ECF No. 310 at 54 (DETR), 108 (IRS). The testimony from both DETR and the IRS was supported with ample documentary evidence. *See* Gov't Exs. 4.01–4.04 (DETR), 5.01–5.03 (IRS).

- Consistent with the testimony from DETR and the IRS, several employees and contractors that worked for Dezfooli testified that there were far fewer employees than reported in the three PPP loan applications. Witness 14, who used to print paychecks at Best Buy Flooring, testified that there was a maximum of ten employees working at the company in March 2020. *See* ECF No. 311 at 85. Witness 15, another former employee, said that there were less than 12 employees at Best Buy Flooring in 2019. *See id.* at 143–44. Witness 16, a third former employee, testified that there were a maximum of thirty people working for the company at any one time. *See id.* at 161. And Witness 18, a former contractor,

- testified that the business had between eight and twelve employees and twenty-four to forty contractors at any one time. *See id.* at 206.
- The property manager for the address listed on all three PPP applications (Witness 6) identified Dezfooli as the CEO of Best Buy Flooring and his primary point of contact. *See* ECF No. 309 at 170–71. Witness 6 testified that Dezfooli and his company were evicted from the property located at 1621 East Sunset Road in March 2019, over a year prior to Dezfooli's submission of the three PPP loan applications listing that address as the business address for each of the three businesses for which Dezfooli sought PPP loans. *See id.* at 174, 179–80.
- Special Agent Leah Chapman of IRS Criminal Investigation ("SA Chapman") testified about her analysis of Dezfooli's bank accounts in 2019 and compared it to the payroll expenditures Dezfooli reported in the three PPP loan applications. *See* Gov't Ex. 469; Trial tr. 6, ECF No. 312 at 93–94. Per SA Chapman's analysis, Dezfooli's PPP loan applications would have amounted to $53,909,959.32 in 2019 payroll expenses, while Dezfooli's own bank accounts themselves totaled only $1,995,179.99 in withdrawals during the entire calendar year. *Id.*

## II. Legal Standard

A forfeiture order may be sought as a money judgment. *See* Fed. R. Crim. P. 32.2(b)(1)(A), (2)(A); *see also United States v. Nejad*, 933 F.3d 1162, 1165 (9th Cir. 2019) ("[W]e see nothing in *Honeycutt* (or any other recent Supreme Court decision) that would allow us to overrule our prior precedent permitting entry of a personal money judgment . . . ."); *United States v. Lo*, 839 F.3d 777, 792–94 (9th Cir. 2016) (upholding a forfeiture money judgment in the amount the defendant received from mail and wire fraud offenses).

Forfeiture statutes "mandate[] that a defendant forfeit a very specific amount—the proceeds of his criminal activity," which can be in the form of a money judgment. *United States v. Casey*, 444 F.3d 1071, 1076 (9th Cir. 2006). This is true regardless of the defendant's ability to

satisfy the judgment at the time of sentencing. *Id.* at 1074 ("imposition of a money judgment on a defendant" who cannot currently satisfy it "furthers the remedial purposes of the forfeiture statute" because it requires the defendant to "disgorge their ill-gotten gains, even those already spent").

The court, and not the jury, determines the appropriate amount of a forfeiture money judgment. *United States v. Daniel*, 676 F. App'x 675, 678 (9th Cir. 2017) (defendant does not have a constitutional or statutory right to a jury determination on the forfeiture money judgment); *United States v. Christensen*, 828 F.3d 763, 821–22 (9th Cir. 2016) (same). This determination is "based on evidence already in the record, including any written plea agreement, and any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).

### III.    Discussion

The government argues in its motion that the evidence at trial demonstrates that $11,231,186.62 is the amount Dezfooli obtained in the course of the offenses of conviction. ECF No. 365 at 9–11. In response, Dezfooli raises four arguments.

He first argues that this motion is premature given the pending motion for judgment of acquittal and sentencing has yet to occur. ECF No. 368 at 3–4. However, as the government correctly points out in its reply, in advance of sentencing the court must "promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment." Fed. R. Crim. P. 32.2(b)(2)(A). This is not a final order but a preliminary one, which will allow the parties ample time to seek to revise or modify the order before it becomes final. *See* Fed. R. Crim. P. 32.2(b)(2)(B) ("[T]he court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Fed. R. Crim. P. 32.2(b)(4)."). Moreover, his motion for judgment of acquittal has now been denied. *See* Order, ECF No. 372.

1        Second, Dezfooli argues that "subsequent proceedings are mandated if the government attempts to enforce a money judgment by seeking the forfeiture of property not listed in the jury's special verdict[.]" ECF No. 368 at 5. Federal Rule of Criminal Procedure 32.2(c)(1) specifically states that "no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment." As the Ninth Circuit explained in *Nejad*, "once the government identifies untainted property that it believes may be used to satisfy a personal money judgment, it must return to the district court and establish that the requirements of § 853(p) have been met." *Pizzuto v. Blades*, 933 F.3d 1166, 1166 (9th Cir. 2019). This has no bearing on what the government currently seeks as there has been no identification of substitute property it seeks to use to enforce the forfeiture judgment it requests—the government simply asks for the preliminary forfeiture judgment in a sum certain. Thus, although Dezfooli is correct about the law, it is not applicable to these circumstances. Should the government wish to take possession for purposes of forfeiture of property unlisted in the jury's special verdict form, it would be subject to additional proceedings.

        Third, Dezfooli argues that the money judgment must be reduced by the amount the government recoups through the sale of the five properties identified as forfeitable in the jury's special verdict. ECF No. 368 at 5–6. He likewise argues that "in the event this Court allows substitute properties to be seized in the future, the market value of those properties must also be credited against the potential money judgement." *Id.* at 6. In its reply, the government does not appear to contest this: "once the specific properties listed in the forfeiture order are sold, the proceeds of those sales will be credited against the personal money judgment." ECF No. 370 at 3. However, the government does caveat that this credit should not be applied until the properties have been sold. *Id.* (citing *United States v. Teves*, 621 F. App'x 486, 487–88 (9th Cir. 2015) (finding no authority to offset amount of money judgment by the value of seized property before it is

sold)). I agree. Thus, Dezfooli will receive credits toward the forfeiture figure for the houses (and other property)[4] once they have been sold.

Finally, Dezfooli argues that should I deny his post-trial motions—which I do in several contemporaneous orders—he will "appeal his convictions and the jury's special verdict," and in so doing, "will request a stay of the final order of forfeiture and any potential money judgment." ECF No 368 at 6. He sets out the test for staying a forfeiture order. *Id.* at 6–7 (citing *United States v. Peters*, 784 F. Supp. 2d 234, 235 (W.D.N.Y. 2011)). As the government aptly points out in its reply, for the court to consider staying an order, the order must first be in place. ECF No. 370 at 3–4. For this reason, together with the fact that his post-trial motion has now been denied, Dezfooli's fourth argument does not bear on my conclusion.

I find that, flushed with cash, Dezfooli embarked on a systematic effort to launder the proceeds of his crimes. Through SA Chapman and others, the government presented substantial testimonial and documentary evidence of Dezfooli's money laundering activity. Accordingly, the government is entitled to the relief it seeks, so their motion for a forfeiture money judgment is granted.

### III.  Conclusion

IT IS HEREBY ORDERED that the government's motion for a forfeiture money judgment in the amount of $11,231,186.52 **[ECF No. 365] is GRANTED**.

Dated: July 16, 2024

_____
Cristina D. Silva
United States District Judge

---

[4] Although the special verdict form also found a nexus to two vehicles, the government asserts that neither has been located at this time. ECF No. 370 at 3 n.1.